# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JESUS BARRERA-BARRON, ) <br> ) <br> Defendant. ) <br> _____) | CRIMINAL ACTION <br><br> No. 12-20066-22-KHV |

## MEMORANDUM AND ORDER

A grand jury charged Jesus Barrera-Barron and some 50 other defendants with conspiracy to manufacture, to possess with intent to distribute and to distribute 280 grams or more of cocaine base and to possess with intent to distribute and to distribute five kilograms or more of a mixture and substance containing cocaine. See Second Superseding Indictment (Doc. #402), Count 1. The grand jury also charged Barrera-Barron with (1) two counts of attempted possession with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana, (2) three counts of money laundering, (3) three counts of using a cellular telephone in facilitating a drug offense, and (4) possession with intent to distribute and distribution of five kilograms or more of cocaine and 100 kilograms or more of marijuana. See id., Counts 71-73, 75-79, 81. This matter is before the Court on defendant's Motion To Suppress All GPS Evidence Seized Pursuant To A Court Order Issued February 8, 2012 (Doc. #540) filed March 4, 2013 and defendant's Motion To Suppress Evidence Seized Pursuant To A Traffic Stop Conducted On February 9, 2012 (Doc. #753) filed June 7, 2013. On July 16, 2013, the Court held an evidentiary hearing. For reasons stated below, the Court overrules defendant's motions.

**Facts**

Based on testimony and exhibits received at the hearing, the Court finds the following facts:

In October of 2010, the United States Drug Enforcement Administration ("DEA") initiated an investigation into the distribution of cocaine by an organization run by Djuane Sykes and his associates, a street gang in Kansas City, Kansas known as "Deuce Deuce." Special Agent Nicholas Wills and Task Force Officer Eric Jones led the investigation which involved the interception of 43 cellular telephones, including multiple roving Title III intercepts on Hector Aguilera. Based on the initial intercepts of three of Sykes's telephones, officers identified multiple layers of sources of cocaine, which was being funneled by various means from Mexico to the Kansas City metropolitan area. From June of 2011 through April of 2012, officers intercepted hundreds of calls.

On February 6, 2012, agents started intercepting conversations between Eduardo Perez-Alcala, who was utilizing Target Telephone #31 and a person initially identified as Unidentified Male (UM) 167.[1] UM167 was utilizing a cellular telephone with International Mobile Subscriber Identity (IMSI) number 316010159200438. The intercepted conversations indicated that UM167 had arrived in the Kansas City area and was waiting to drop off narcotics to Perez-Alcala. In the evening hours of February 7, 2012, agents intercepted additional calls between Perez-Alcala and UM167. The historical investigation and intercepted calls revealed that UM167 was to drop off narcotics to Perez-Alcala and then return to the border area with U.S. currency.

On February 8, 2012, DEA Task Force Officer Kris Rutherford applied for and received a GPS ping order for the cellular phone with IMSI 316010159200438 which was associated with

---

[1] Based on other evidence, officers now believe that UM167 is Barrera-Barron, but they did not draw this conclusion until after defendant was arrested.

UM167. Officer Rutherford began monitoring the results of the GPS ping at approximately 8:00 p.m. on February 8, 2012. The pings showed no results until February 9, 2012, at approximately 1:23 p.m., when they showed a six meter ping at a Petro Stopping Center in Oklahoma City, Oklahoma. In an attempt to coordinate a stop, Officer Rutherford began communicating the GPS data information to law enforcement officers in Oklahoma City.

Before law enforcement officers could locate the phone, GPS pings indicated that the cell phone had moved westbound on I-40 to a Shell gas station near Exit 130. Based on the GPS pings, officers believed that the target phone was in one of nine semi trucks at the Banner Shell Station near El Reno, Oklahoma or with an occupant or recent occupant of one of those vehicles. Beginning around 7:30 p.m. and continuing for some two hours, Canadian County Deputy Jeff Allen followed a total of five trucks as each one left the gas station. He followed two of the trucks to the end of his jurisdiction and did not stop them because he did not observe any traffic violations or other probable cause to stop them. He stopped two other trucks and gave the drivers warnings for traffic violations.

Shortly before 9:45 p.m., Deputy Allen observed defendant's semi truck leaving the gas station. He started to follow the vehicle westbound on I-40. Deputy Allen observed that defendant's vehicle swerved within the lane, crossed over the fog line and shoulder onto the rumble strip (some 12 inches from the fog line), ran down the rumble strip for a short distance and then stayed on the fog line for a "considerable distance." Deputy Allen did not believe that weather was a factor in defendant's failure to maintain his lane. Deputy Allen activated his emergency lights. Defendant continued traveling west until reaching the 125 mile marker, where he finally pulled over and stopped. Deputy Allen testified that he stopped defendant's vehicle because he observed a violation

of Oklahoma law which requires drivers to drive as nearly as practicable entirely within a single lane.

Deputy Allen contacted defendant, who had exited the truck, next to the cab of the truck. Deputy Allen asked him if he was traveling alone. After hesitating for a second, defendant replied "yes." Deputy Allen asked defendant for his driver's license, insurance, bill of lading and log book. Deputy Allen thought it was unusual that defendant had to return to the cab to retrieve those items because most drivers expect to be asked for such items from law enforcement and bring them out of the truck. Deputy Allen saw that defendant had to search around the front of his truck to find the documents, which Deputy Allen also noted as being unusual. Deputy Allen noted that defendant appeared very nervous. Defendant's hands appeared to shake to the point that he kept dropping items on the floor of the truck. Defendant finally returned to Deputy Allen's location and Deputy Allen asked him to have a seat in the front seat of Deputy Allen's police car.

After getting into the police car, Deputy Allen again asked defendant for his documents and driver's license. Defendant produced his insurance and log book, but had forgotten his driver's license and bill of lading. Defendant and Deputy Allen returned to the cab so he could retrieve the rest of the documents. While defendant was in the cab, Deputy Allen heard him speaking in Spanish to another person in the vehicle. Deputy Allen again asked him if anyone else was in the vehicle. This time, defendant admitted that his girlfriend was in the sleeper compartment. Deputy Allen asked him to have her step out and have a seat where Deputy Allen could see her. When she complied, Deputy Allen asked for her driver's license. She stated that she did not have one but gave Deputy Allen a Texas ID card indicating that her name was Melissa Franco. Defendant finally found his driver's license and bill of lading and returned to Deputy Allen's vehicle.

While defendant was seated in the police car, Deputy Allen noted that he still appeared to be very nervous. His hands were still shaking to the point he dropped his license twice while trying to hand it to Deputy Allen. As Deputy Allen was going through the documents, through his dispatcher he requested a license and warrant check on both defendant and Franco.

Deputy Allen found defendant's actions and demeanor to be very unusual because of his high level of anxiety, which was uncharacteristic of a professional driver. Deputy Allen informed defendant that he was going to issue him a warning for improper lane use and that it would not appear on his driving record. Lieutenant Jason Glass and his canine partner, Gunner, arrived and walked up to the semi truck. Defendant noticed them and became fixated on them until they were out of sight at the front of the truck.

As Deputy Allen was completing the warning ticket, he asked defendant about his cargo and destination. Defendant said he thought the cargo was fork lifts and machine parts that were going to Santa Rita, New Mexico. Without being asked, defendant went on to advise that he was not present when the cargo was loaded. He said his other driver had called him from Tulsa, Oklahoma and had quit. Defendant had therefore flown from El Paso to Tulsa the day before to pick up the truck and cargo and complete the run. Defendant stated that Franco had come along for the ride. After completing the statement, defendant took a deep breath and yawned nervously. About this time, Lieutenant Glass and Gunner came back into view and defendant again became fixated on them.

Dispatch contacted Deputy Allen and advised that Barrera-Barron only had a valid class D driver's license and that his Commercial Driver's License (CDL) "A," which is required to operate a semi truck, was of ineligible status. Dispatch advised that the CDL A had been suspended for an

alcohol violation, but was no longer suspended. Deputy Allen asked defendant about this and he stated that he thought he was allowed to drive. Deputy Allen requested a wrecker and told defendant that he was going to impound the truck until he could make arrangements for a properly licensed driver to come and pick it up.

Deputy Allen asked Franco to exit the semi truck and sit with them in the police car to wait for the wrecker. While walking back to his car, Deputy Allen asked Franco why she was traveling with defendant. Franco stated that she always rode with defendant. Deputy Allen asked where they were coming from. She said that they had caught a ride to Tulsa with a friend, so defendant could pick up the truck and cargo. Deputy Allen asked why they hadn't flown. Franco stated that defendant was afraid to fly, which was in direct contradiction to what defendant had told Deputy Allen.

After having defendant and Franco sit in the rear of his vehicle, Deputy Allen spoke to Lieutenant Glass and informed him of the indicators he had observed. Lieutenant Glass advised that Gunner had alerted for narcotics on the driver's door and the underside of the trailer near the landing gear. Deputy Allen decided to impound the truck to complete a search of the truck at the wrecker yard due to the hazardous conditions of the roadway. It had been raining for several hours and had begun to snow.

During a search of the truck, law enforcement officers located six bundles of cash in the battery box behind the driver's door, along with two small bundles of loose cash inside the factory compartment inside the cab of the truck. Officers recovered $61,539.00 in U.S. currency. The cargo in the trailer was found to be quite suspicious, in that it included various items that appeared not to have been moved for an extended time.

**Analysis**

Defendant seeks to suppress evidence from the search of his vehicle and subsequent statements because (1) officers illegally obtained GPS data from a cell phone to track him and (2) officers did not have a sufficient basis to stop or search his vehicle.

**I.     GPS Data From Cell Phone**

Initially, the Court finds that defendant lacks standing because the evidence does not establish that he had possession of the cell phone or a reasonable expectation of privacy in the GPS data from the phone. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Fourth Amendment rights are personal and cannot be claimed vicariously. Rakas v. Illinois, 439 U.S. 128, 133-34 (1978); United States v. Valdez, 333 F.3d 1206, 1208 (10th Cir. 2003). Given the personal nature of the interest, standing is a matter of substantive Fourth Amendment law. Rakas, 439 U.S. at 140. Standing inquiries thus turn on the classic Fourth Amendment test: (1) whether defendant manifested a subjective expectation of privacy in the area searched and (2) whether society is prepared to recognize that expectation as objectively reasonable. Valdez, 333 F.3d at 1208-09; United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000); United States v. Benitez-Arreguin, 973 F.2d 823, 827 (10th Cir. 1992). Defendant bears the burden to show that he had a legitimate expectation of privacy in the invaded place. See United States v. Gordon, 168 F.3d 1222, 1226 (10th Cir.), cert. denied, 527 U.S. 1030 (1999); see also United States v. Eckhart, Nos. 07-4216, 07-4022, 2009 WL 1841695, at *8 (10th Cir. June 29, 2009) (proponent of motion to suppress has burden to show his own rights violated by challenged search); Allen, 235 F.3d at 489 (same).

As noted, the GPS pings led officers to believe that the target phone was in one of nine semi trucks at the Banner Shell Station or with an occupant or recent occupant of one of those vehicles. Defendant correctly notes that officers never recovered or located the phone and never connected the phone to him. See Memorandum In Response In Support Of Defendant's Motions To Suppress And The Suppression Hearing Held July 16, 2013 (Doc. #900) filed July 18, 2013 at 8. Absent a connection between defendant and the phone, defendant has not met his initial burden to show lawful possession of the searched property. The Court therefore overrules defendant's motion to suppress based on the GPS data.

B.     Expectation Of Privacy

Even if defendant could show lawful possession of the cell phone, which he expressly disclaims, he has not shown that he manifested a subjective expectation of privacy in the phone. The Court agrees substantially with the reasoning of the Sixth Circuit as follows:

> If a tool used to transport contraband gives off a signal that can be tracked for location, certainly the police can track the signal. The law cannot be that a criminal is entitled to rely on the expected untrackability of his tools. [Footnote 1:] We do not mean to suggest that there was no reasonable expectation of privacy because defendant's phone was used in the commission of a crime, or that the cell phone was illegally possessed. On the contrary, an innocent actor would similarly lack a reasonable expectation of privacy in the inherent external locatability of a tool that he or she bought. [end footnote] Otherwise, dogs could not be used to track a fugitive if the fugitive did not know that the dog hounds had his scent. A getaway car could not be identified and followed based on the license plate number if the driver reasonably thought he had gotten away unseen. The recent nature of cell phone location technology does not change this. If it did, then technology would help criminals but not the police. It follows that [defendant] had no expectation of privacy in the context of this case, just as the driver of a getaway car has no expectation of privacy in the particular combination of colors of the car's paint.
>
> This conclusion is directly supported by United States v. Knotts, 460 U.S. 276, 103 S. Ct. 1081, 75 L.Ed.2d 55 (1983). In Knotts, the police, with the consent of a chemical company, placed a beeper in a five-gallon drum of chloroform in order to track the movements of a defendant and discover the location of a clandestine drug

laboratory. Using visual surveillance, as well as the signal emitted from the beeper when police lost visual contact, law enforcement officials traced the car to a secluded cabin, where the defendant and others had been manufacturing illicit drugs. The Supreme Court held that this monitoring did not violate the Constitution because "[t]he governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways.... A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." Id. at 281, 103 S. Ct. 1081. The Court noted that, in Knott's case, "[a] police car following [a defendant] at a distance throughout his journey could have observed him leaving the public highway and arriving at the cabin. . . . [T]here is no indication that the beeper was used in any way to reveal information . . . that would not have been visible to the naked eye." Id. at 285, 103 S. Ct. 1081. Similar to the circumstances in Knotts, [defendant] was traveling on a public road before he stopped at a public rest stop. While the cell site information aided the police in determining [defendant's] location, that same information could have been obtained through visual surveillance.

There is no inherent constitutional difference between trailing a defendant and tracking him via such technology. Law enforcement tactics must be allowed to advance with technological changes, in order to prevent criminals from circumventing the justice system. The Supreme Court said as much in Knotts, noting that, "[i]nsofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now." Id. at 284, 103 S. Ct. 1081. In drawing this conclusion, the Court discussed Smith v. Maryland, 442 U.S. 735, 744–45, 99 S. Ct. 2577, 61 L.Ed.2d 220 (1979), where a defendant was found to have no reasonable expectation of privacy in the numbers he dialed on his phone, even after that information was automated by the phone company. The Court compared this technology to giving the numbers to a telephone operator, where they would not be confidential: "We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate." Knotts, 460 U.S. at 283, 103 S. Ct. 1081. Similar reasoning compels the conclusion here that [defendant] did not have a reasonable expectation of privacy in the location of his cell phone while traveling on public thoroughfares.

United States v. Skinner, 690 F.3d 772, 777-78 (6th Cir. 2012).

Here, defendant has not shown that he manifested a subjective expectation of privacy in a phone which he did not even know existed until his arrest. The phone was not registered to defendant or his business, "Barrera Transportation." See United States v. Suarez-Blanca, No.

- 9 -

1:07-CR-0023, 2008 WL 4200156, at *5 (N.D. Ga. Apr. 21, 2008) (individual does not have legitimate expectation of privacy in items not in individual's name or when individual uses alias or fictitious name and no other evidence links defendant to item); see also Rakas v. Illinois, 439 U.S. 128, 134 (1978) (person aggrieved by illegal search of another's premises or property suffers no Fourth Amendment violation).[2] Moreover, no evidence connects the phone to defendant. Accordingly, defendant does not have standing to contest the use of GPS data from the phone. See United States v. Cannon, No. 6:11-cr-02302-JMC-1, 2012 WL 5386045, at *2 (D.S.C. Nov. 1, 2012) (because defendant failed to establish that he had any interest in phone, he has no standing to challenge order authorizing release of GPS information).[3]

## II. Traffic Stop

### A. Reasonable Suspicion To Stop Vehicle

Defendant argues that Deputy Allen did not have reasonable suspicion to stop his vehicle. A traffic stop constitutes a seizure for purposes of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." Brendlin v. California, 127 S. Ct. 2400, 2406 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)). The Court analyzes the

---

[2] An individual who is not the registered owner of a telephone may establish standing to challenge a search if "other evidence" links the individual to the phone in someone else's name. United States v. Dooley, 2013 WL 2548969, at *18 n.40 (N.D. Ga. June 10, 2013); see United States v. Garcia-Bercovich, 582 F.3d 1234, 1236 (11th Cir. 2009) (reasonable expectation of privacy where other evidence showed defendant's full name matched name on intercepted package, and he had retrieved similarly addressed packages); United States v. Finley, 477 F.3d 250, 259 (5th Cir. 2007) (reasonable expectation of privacy where other evidence showed phone registered in defendant's employer's name and phone was issued to defendant, he was permitted to use it for personal purposes, and defendant took normal precautions to maintain his privacy in telephone). Here, defendant claims that no evidence links him to the phone.

[3] Even if defendant could establish standing to challenge the use of GPS data from the phone, the Court would overrule his challenge on the merits for substantially the reasons stated in the government's Response To Defendant's Motion To Suppress (Doc. #871) and the government's Supplemental Response To Defendant's Motion To Suppress (Doc. #904).

legality of a traffic stop under the investigative detention principles of Terry v. Ohio, 392 U.S. 1 (1968). Under the Fourth Amendment, a traffic stop is reasonable at its inception if the officer has a reasonable articulable suspicion that the motorist violated applicable traffic and equipment regulations. United States v. Ozbirn, 189 F.3d 1194, 1197 (10th Cir. 1999); see United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993) (detaining officer must have objectively reasonable articulable suspicion that traffic violation occurred or is occurring). The government bears the burden of proving the reasonableness of the officer's suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998); see also United States v. Lutz, 207 F. Supp.2d 1247, 1255 (D. Kan. 2002) (government must show traffic stop justified by reasonable articulable suspicion of illegal activity).

Here, Deputy Allen saw defendant's vehicle swerve in his lane, cross over the fog line onto the rumble strip (some 12 inches from the fog line), run down the rumble strip for a short distance and then stay on the fog line for a "considerable distance." Deputy Allen testified that despite light rain, he did not believe that weather was a factor in defendant's failure to maintain a single lane. Based on his observations, Deputy Allen possessed a reasonable articulable suspicion that defendant had violated Oklahoma law which requires motorists to drive "as nearly as practicable entirely within a single lane." Oklahoma Stat. Title 47, § 11-309 (whenever roadway divided into two or more clearly marked lanes for traffic, "A vehicle shall be driven as nearly as practicable entirely within a single lane"); see United States v. Brown, No. 05-3400, 2007 WL 1241646, at *6 (10th Cir. Apr. 30, 2007) (officer's observation of vehicle straying out of lane multiple times over short distance without explanation creates reasonable suspicion that driver violated state statute); United States v. Landshof, 77 Fed. App'x 482, 484 (10th Cir. 2003) (reasonable suspicion for vehicle stop where officer observed vehicle weave within traffic lane and cross approximately six inches over

line in optimal conditions, and officer believed driver was tired); United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir.1999) (probable cause to stop vehicle after motor home drifted onto shoulder twice within quarter mile under optimal road, weather and traffic conditions). But compare United States v. Gregory, 79 F.3d 973, 978 (10th Cir. 1996) (no reasonable suspicion based on isolated incident of vehicle crossing into emergency lane of roadway where road was winding, terrain mountainous and weather condition was windy).

B. Canine Search

Defendant argues that Gunner's alert was insufficient to establish probable cause because Gunner is unreliable. Without more, a drug dog's alert is sufficient to establish probable cause to search a vehicle or closed container. United States v. Rosborough, 366 F.3d 1145, 1152 (10th Cir. 2004). Defendant can rebut the finding of probable cause by showing that the particular drug dog is unreliable. See United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993) (dog alert may not provide probable cause if dog has poor accuracy record). The Tenth Circuit has held that a 70 to 80 per cent reliability rate satisfies the liberal standard for probable cause under Gates. See United States v. Kennedy, 131 F.3d 1371, 1378 (10th Cir. 1997).

Here, Gunner's reliability rate is not specified, but Lieutenant Glass testified that in a controlled environment, Gunner has never given a false alert. Lieutenant Glass testified that Gunner is a certified canine and that they have worked together since 2009. Defendant has not presented evidence which would suggest that Gunner is unreliable. Defendant notes that in this case, Gunner alerted for narcotics but officers only found currency. Motion To Suppress Evidence Seized Pursuant To A Traffic Stop Conducted On February 9, 2012 (Doc. #753) at 4. As Lieutenant Glass explained, however, the odor of narcotics is often present even after narcotics have been removed. Gunner's alert to the odor of narcotics therefore was sufficient to establish probable cause to search

the vehicle.

C. Continued Detention

Defendant argues that his continued detention was unwarranted because officers detained him "long after the reasonable period for a traffic stop concluded." Motion To Suppress Evidence Seized Pursuant To A Traffic Stop Conducted On February 9, 2012 (Doc. #753) at 3. Gunner alerted to the presence of narcotics before Deputy Allen completed the paperwork for defendant's warning. Defendant has not shown that Deputy Allen unnecessarily prolonged the stop. In particular, based on the following, Deputy Allen had ample reason to continue to detain and question defendant and his vehicle:

1. Defendant did not have a valid commercial driver's license;

2. Defendant was extremely nervous throughout the entire traffic stop;

3. Defendant did not have readily available the standard documentation for commercial truck drivers;

4. Defendant falsely denied that anyone else was in the truck; and

5. Defendant gave suspicious answers about the circumstances of his trip.

Based on these factors, Deputy Allen had reasonable suspicion of criminal activity to continue to question defendant.

**IT IS THEREFORE ORDERED** that defendant's Motion To Suppress All GPS Evidence Seized Pursuant To A Court Order Issued February 8, 2012 (Doc. #540) filed March 4, 2013 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that defendant's Motion To Suppress Evidence Seized Pursuant To A Traffic Stop Conducted On February 9, 2012 (Doc. #753) filed June 7, 2013 be and

hereby is **OVERRULED**.

Dated this 1st day of August, 2013 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
